**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

STEPHANIE PORTWOOD, mother,　　　　)
individually, and personal representative　)
of ERIC STEFAN BAGGETT, deceased,　)
and A.L.B., minor daughter and heir at law)
of ERIC STEFAN BAGGETT, deceased,　)
　　　　　　　　　　　　　　　　　　)　　**Case No. 3:13-cv-0186**
　　　　**Plaintiff,**　　　　　　　　　)　　**Judge Aleta A. Trauger**
　　　　　　　　　　　　　　　　　　)
**v.**　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
MONTGOMERY COUNTY,　　　　　　)
TENNESSEE,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　**Defendant.**　　　　　　　　　)

## MEMORANDUM

Pending before the court is a Motion for Summary Judgment (Docket No. 34), filed by

the defendant, Montgomery County, Tennessee (the "County"), to which the plaintiff, Stephanie

Portwood, has filed a Response in opposition (Docket No. 43), and the County has filed a Reply

(Docket No. 46). In support of the pending motion, the defendant filed a Statement of

Undisputed Facts ("DSUF"), to which the plaintiff filed a Response. (Docket No. 36, Docket

No. 44, Ex. 11.) In opposition to the County's motion, the plaintiff filed a Statement of

Additional Facts in Dispute ("PSAF"), to which the County filed a Response. (Docket No. 44,

Ex. 11; Docket No. 49.) The parties have also filed a variety of exhibits in support of their

respective briefs, including transcripts of witness depositions, witness affidavits, and various

documents related to Mr. Baggett's incarceration and the events leading to his death. With

respect to the evidence before the court, also pending is a Motion to Strike the Declaration of

Ron McAndrew filed by the County (Docket No. 47), to which the plaintiff has filed a Response

in opposition (Docket No. 50), and the County has filed a Reply (Docket No. 53). For the

reasons discussed herein, the County's Motion to Strike will be denied and the County's Motion for Summary Judgment will be granted.

**BACKGROUND**[1]

## I. Overview

### A. The Parties

This lawsuit stems from the tragic death of Eric Stefan Baggett, a 23-year-old father and son. Mr. Baggett died on February 6, 2012, when he was in the custody of the County and serving time at the Montgomery County Jail (the "Jail"). Ms. Portwood, Mr. Baggett's mother, has sued the County on behalf of herself, her son, and her minor granddaughter. In sum, she alleges that the County is liable for Mr. Baggett's death pursuant to 42 U.S.C. § 1983 because it deprived Mr. Baggett of his Eighth Amendment right to receive proper medical care while in custody at the Jail.

The Jail is a pre-trial detention facility with a capacity of 736 inmates. The Jail is staffed by more than 130 employees who handle inmate booking and processing, visitation, transportation to court, and inmate and facility security. Medical services at the Jail are provided by Correct Care Solutions[2] ("CCS") pursuant to a contract between CCS and the County.

### B. Housekeeping Matters

As an initial matter, before discussing the facts as set forth in the DSUF and PSAF, the court will address the County's contention that the plaintiff, in error, failed to properly "admit"

---

[1] The facts are drawn from the DSUF and the plaintiffs' responses thereto (Docket No. 36, Docket No. 44, Ex. 11), the PSAF and the defendant's responses thereto (Docket No. 44, Ex. 11, Docket No. 49), as well as the exhibits filed by the parties in support of their briefs (Docket Nos. 37-40 (defendant), Docket No. 44, Exs. 1-10 (plaintiff).)

[2] CCS was named in the plaintiff's Amended Complaint as a defendant in this action. On November 25, 2013, the court dismissed CCS from the action with prejudice. (Docket No. 27.)

or "dispute" several facts set forth in the DSUF. Throughout her Response to the DSUF, the plaintiff, instead of stating "admit" or "dispute" as to facts related to the conduct of CCS, responded with a form objection. The form objection states:

> Plaintiff submits the materials cited do not establish the presence of a genuine dispute, denies this fact is material, and further submits the Defendant cannot produce admissible evidence to support the fact because CCS has been dismissed from the case by previous order of the Court (Docket Entry # 27). The actions of CCS and its employees are irrelevant to this case.

(Docket No. 40.) This objection (or some form of it) appears approximately 34 times in the plaintiff's Response to the DSUF. The plaintiff's objection appears to be premised upon the court's dismissal of CCS from this case and its decision to strike the County's comparative fault defense as to CCS in its November 25, 2013 Order. The plaintiff appears to be attempting to ask the court to completely disregard the actions of CCS (and other third-party medical providers) merely because CCS is no longer a defendant. Further, the plaintiff appears to object to the admissibility of evidence offered by Nurse Melinda Stephens only because she is an employee of CCS.

The plaintiff's objection, as it relates to the admissibility of Nurse Stephens' testimony and the relevance of CCS's actions, is without merit. The plaintiff offers no valid objection to the admissibility of Nurse Stephens' testimony with respect to its relevancy to the chronology of events leading to Mr. Baggett's death. Moreover, the County submits that it does not offer Nurse Stephens' testimony in an effort to show fault on the part of CCS; rather, it offers her testimony to establish a timeline of events. Accordingly, absent other (meritorious) objections by the

plaintiff, the court will consider Nurse Stephens' deposition testimony for purposes of establishing a timeline.[3]

Finally, the court notes that both parties appear to have taken liberty with the Federal Rules of Evidence, particularly with respect to the admissibility of hearsay testimony and the authentication of documents. At the summary judgment stage, it is well settled that evidence submitted to the court must be admissible. *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007). Moreover, to be considered on summary judgment, "documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2722 (1998). "Documents which do not meet those requirements cannot be considered by the court." *Woodruff v. Nat'l Life Ins. Co.*, No. 3:05-cv-330, 2006 WL 2792204, at *1 (E.D. Tenn. July 24, 2006).

Here, the court has disregarded certain inadmissible evidence for purposes of its decision, including the unsworn and unauthenticated statements of Deputy Adam Donaway, Deputy Jamie Norman, and Corporal James Moose submitted by the plaintiff (Docket No. 44, Exs. 5-7), as well as certain hearsay testimony included in witness depositions and affidavits.

## II.  **Mr. Baggett's Incarceration**

On the evening of January 23, 2012, Mr. Baggett voluntarily turned himself in to the Jail for violating his probation. On January 24, 2012, at 1:21 a.m., a nurse at the Jail performed an

---

[3] The defendant has asked that, in light of the plaintiff's repeat objections, the court consider the facts challenged by the objection to be "undisputed." The court declines to do so. Although the plaintiff's objections as to admissibility and relevancy are without merit, the plaintiff has not failed to properly respond to the County's assertions of fact and, therefore, Fed. R. Civ. P. 56(e) does not apply here.

"Inmate Receiving Screening and Health Assessment" on Mr. Baggett and reported Mr. Baggett's health as normal. Mr. Baggett was housed in a section of the Jail called "N Pod."

**A. The Jail's Sick Call Policy**

The Jail has certain policies and procedures in place to govern the provision of medical care to inmates. Under the Jail's policy governing the provision of medical care to inmates, when in need of medical care, inmates may request a "Health Service Request form," also called a "sick call slip," from a deputy. Any inmate in the facility who requests a sick call slip is to be given the slip in a timely manner. The deputy who receives the sick call slip from the inmate is tasked with categorizing the request as "emergent" or "nonemergent" to ensure that a potential medical emergency does not exist. In cases where an emergency exists, deputies are trained to radio medical staff immediately.

According to the policy, after an inmate gives his sick call slip to a deputy, the deputy submits the slip to the supervisor on duty, who scans the slip for any suicidal statement or emergency situation. The slips are collected and placed in a "sick call box" at a central location and are then picked up by the medical staff for review.

Nurse Stephens, the health services administrator at the Jail, testified at her deposition that CCS medical staff (hereinafter, "CCS") picks up the sick call slips once per day and performs a review process on the forms. CCS reviews the pending slips for "anything emergent in nature" and, subsequently, schedules inmates for "sick call," which appears to be an appointment during which inmates seeking care are evaluated by a nurse. (Docket No. 37, Ex. 1.) Sick call takes place five days per week; inmates are not scheduled for evaluation on the weekend.

The County relies primarily on the testimony of Nurse Stephens, who authenticated Mr. Baggett's medical records, and the medical records themselves, to set forth a timeline of events in its DSUF. The court notes that, other than examining Mr. Baggett on February 3, 2012, Nurse Stephens did not appear to have any interaction with Mr. Baggett during his incarceration. Accordingly, her testimony related to the events prior to and after her examination of Mr. Baggett appears to be premised entirely on the information contained within Mr. Baggett's medical records.

### B. Mr. Baggett's First Sick Call Slip

On January 25, 2012,[4] Mr. Baggett submitted a sick call slip ("First Sick Call Slip"). In the form's section titled "Nature of Problem or Request," he wrote "extreme coughing and nose running [sic] I think I might have broncitus [sic]." It appears to be undisputed that the First Sick Call Slip, which is part of Mr. Baggett's inmate medical records file, is stamped as received by CCS at 2:00 a.m. on January 26, 2012.[5] On the lower half of the slip, it states: "Received/Triage Date: 1/26/12" at 5:00pm and "Refer to: Nursing." Nurse Stephens testified that the First Sick

---

[4] In her response to the DSUF, the plaintiff disputes the date of the sick call slip on the ground that "[t]here is no way to tell what date the sick call slip was submitted as the form is illegible." Although the court notes that a colored stamp very lightly obscures Mr. Baggett's handwriting, the "Date of Request" field remains legible and reads "1-25-12." (*See* Docket No. 37, Ex. 1 at Ex. 1.) Accordingly, the court does not consider the date of the First Sick Call Slip to be disputed on the ground raised by the plaintiff.

[5] Paragraph 12 of the DSUF, which asserts the date stamp that appears on Mr. Baggett's First Sick Call Slip, is an example of the plaintiff's improper form objection. The fact reads: "Eric Baggett's sick call slip dated January 25, 2012 is stamped as received by CCS at 2:00a.m. on January 26, 2012. (Stephens Depo., p. 24, 1. 4-12)." (Docket No. 44, Ex. 11 at ¶ 12.) Exhibit 1, attached to Nurse Stephens' deposition transcript, is the First Sick Call Slip and it includes a stamp reflecting the information stated in Paragraph 12 of the DSUF. Nevertheless, the plaintiff responded to Paragraph 12 with its form objection and did not "admit" or "dispute" whether the document is itself stamped to reflect the time and date stated by the County.

Call Slip was signed by one of CCS's employees, Nurse Jessica Ison. Finally, in a section titled "Health Care Documentation" and subtitled "Response to Inmate," handwritten text states "Pt Refused sickcall [sic] 1/30/12 per-jail security" and includes a signature. Nurse Stephens testified at her deposition that this handwritten notation was signed by Nurse Ison.

According to the record before the court, four days passed after Mr. Baggett submitted the First Sick Call Slip during which he did not receive medical treatment. Mr. Baggett's medical records, authenticated by Nurse Stephens, contain a "Medical Refusal Form" dated January 30, 2012 ("Refusal Form"). The Refusal Form is not signed by Mr. Baggett and does not appear to contain any writing in Mr. Baggett's hand. Instead, Nurse Stephens testified at her deposition that the Refusal Form appears to have been filled out by a corrections officer, Deputy William Williamson. The Refusal Form, which includes a time stamp of 9:58 a.m., notes Mr. Baggett's location as Tower 5, Cell N5U. The Refusal Form includes Mr. Baggett's name and inmate identification number and, in typed text, states:

> I hereby voluntarily refuse to receive or accept a scheduled medical service provided to me by the contracted medical staff of the Montgomery County Jail & Penal Farm. I fully understand that I will continue to be offered full medical services as prescribed on a continuing basis, and signing this refusal form only addresses this particular time and date that I was scheduled to receive a medical service.

In a field on the form titled "Inmate's signature," Deputy Williamson appears to have written "Refused to sign." The form is signed by Deputy Williamson and includes an illegible signature in a field titled "Signature of Second Staff Member," which is required under Jail policy only when an inmate has refused to sign a form.[6] It is undisputed that, although the County relies on

---

[6] The plaintiff submits that the second signature on the Refusal Form belongs to Deputy Adam Patrick Donaway. In support of her opposition to the pending motion, the plaintiff submitted an unsworn and unauthenticated statement of Deputy Donaway, which she argues supports a finding that Mr. Baggett did not, in fact, refuse medical care on January 30, 2012. (Docket No.

her testimony to authenticate the Refusal Form, Nurse Stephens has no personal knowledge regarding the Refusal Form or whether Mr. Baggett refused treatment on January 30, 2012. Indeed, other than the Refusal Form, there is no evidence in the record as to Mr. Baggett's alleged refusal of sick call, and no witness with personal knowledge as to the events of January 30, 2012 has submitted testimony. The court notes that, based on the absence of any notation or signature from Mr. Baggett on his First Sick Call Slip or the Refusal Form, the plaintiff disputes that Mr. Baggett was called for medical treatment on January 30, 2012.

### C. Second Sick Call Slip

On February 1, 2012, Mr. Baggett submitted a second sick call slip ("Second Sick Call Slip"). Mr. Baggett described the nature of his request: "Im sick Been coughing Bad runny nose cant breath [sic]. Ive Been like this For over a week need medical attention ASAP." (Docket No. 37 at 103.) The Second Slip Call Slip is marked as received at 5:00pm on February 2, 2012 and is signed by Nurse Ison, who checked a box to refer the inmate to a nurse.

### D. Mr. Baggett's Cellmate Refuses to Return to Cell

On the evening of February 2, 2012, another inmate, Aaron Watson, who was sharing a cell with Mr. Baggett, informed corrections officers that he refused to go back into his cell after recreation because his cellmate was ill. In a declaration submitted by the County in support of its motion, Corporal James Moose states that he personally instructed Mr. Watson to go into his cell two times and Watson refused. (Docket No. 38.) Moose further states that Watson threatened

---

44, Ex. 5.) The statement appears was written by Deputy Donaway for the purposes of an internal County investigation performed by Investigator Cerceres. The statement, dated February 7, 2012 (one day after Mr. Baggett's death), states: "Deputy Williamson came up to me stating I have a medical refusal form from Baggett need a 2nd name signed on it. I signed the refusal but had no contact with Inmate Baggett. End of Statement." (Docket No. 44, Ex. 5.) Because Deputy Donaway's statement is inadmissible as filed, the court has disregarded it for purposes of summary judgment.

that, if Moose ordered Watson to enter his cell, Watson would break the sprinkler in the cell.

(*Id.*)  As a result of Watson's behavior, Moose recommended that Watson be "locked down" for

240 hours with a loss of privileges for two weeks.  (*Id.*)

Moose further testified that, also on February 2, 2012, Mr. Baggett asked Moose when

Mr. Baggett would see the nurse.  According to Moose's statement, Mr. Baggett informed Moose

that he had been sick for the past week and had submitted numerous sick calls.  Moose states that

he called the infirmary to inquire about Mr. Baggett's sick call status, and a nurse replied to

Moose that Mr. Baggett had an appointment with the nurse the next day, Friday, February 3,

2012.  According to his declaration, Moose relayed this information to Mr. Baggett.

### E.  Mr. Baggett Sees the Nurse

It appears to be undisputed that Mr. Baggett was evaluated by Nurse Stephens at the

infirmary on February 3, 2012.  With respect to the evaluation, Nurse Stephens testified at her

deposition that:

> [Mr. Baggett] came in, he complained of a constant cough since arrival.  He told
> me that his roommate had moved out of his – today because of it.  He denied
> fever, chills, nausea, vomiting.  He said it was respiratory only.  HE said that he
> was having a productive yellowish phlegm . . . .  I examined him by taking his
> vital signs.  I examined his lungs.  I examined his mouth and his nasal passages.
> And I was able to hear a cough.

(Docket No. 37, Ex. 1 at 36.)  Nurse Stephens further testified that Mr. Baggett was in a state of

discomfort, that his cough was moist and that she typically saw such symptoms with a cold, an

allergy, or a sinus infection.  Nurse Stephens made notes on Mr. Baggett's Second Call Slip that

are consistent with her deposition testimony.  She further testified that she recommended that

Mr. Baggett increase his water intake and rest, and she reached out to a physician's assistant

working as the "on-call provider" for the Jail.  It appears to be undisputed that the County's

physician's assistant prescribed Zyrtec, an antihistamine, for Mr. Baggett.  It appears to be

further undisputed that Mr. Baggett received Zyrtec from registered nurses working at the Jail on the evenings of February 3, February 4, and February 5, 2012.

## III.  Mr. Baggett's Death

At approximately 4:43a.m. on February 6, 2012, Mr. Baggett was found unresponsive in his cell by Deputy Price and Deputy Dudley.  His medical records include reports from Gateway Medical Center, where he was pronounced dead at 5:49a.m.  It appears undisputed that the cause of Mr. Baggett's death was reactive airway disease.[7]

## IV.  The Action

Ms. Portwood filed this action against Montgomery County on February 4, 2013, in the Circuit Court for Montgomery County at Clarksville, Tennessee.  (Docket No. 1, Ex. 1).  The Complaint alleged civil rights violations pursuant to 42 U.S.C. § 1983 against the County, as well as claims under the Tennessee Governmental Tort Liability Act, T.C.A. § 29-20-101, *et seq.* ("GTLA"), the Tennessee Wrongful Death Statute, T.C.A. § 29-5-101, *et seq.*, and common law negligence claims.  Montgomery County removed the action to this court on March 5, 2013, and answered the Complaint on March 13, 2013.  (*See* Docket Nos. 1, 5.)  In its answer, Montgomery County asserted various affirmative defenses, including the doctrine of comparative fault as to the County's medical service provider, CCS.  (Docket No. 5 at 8-9.)

Ms. Portwood moved to strike the County's affirmative defense related to CCS pursuant to Rule 12(f) on May 29, 2013.  Two days after filing her motion to strike, Ms. Portwood filed her First Amended Complaint ("FAC"), which added claims against CCS under the THCLA.

---

[7] The plaintiff has filed an unauthenticated autopsy report with her response in opposition to the summary judgment motion.  The report, which the County does not challenge as inadmissible, states pathologic diagnoses with respect to Mr. Baggett, including severe pulmonary edema and congestion; microscopic features of allergic reactive airway disease; clinical history of recent upper respiratory illness; and marked right ventricular dilation of the heart.

CCS filed a motion to dismiss the FAC on June 26, 2013, and the court granted the motion on procedural grounds on November 25, 2013.  (Docket Nos. 20 (Motion), 27 (Order).)  The court also granted Ms. Portwood's motion to strike the County's affirmative defense.  (Docket No. 27.)  Following the dismissal of CCS from the action, Ms. Portwood's remaining claims against the County include her Section 1983 civil rights claim and two Tennessee state law claims, including a GTLA claim and a common law negligence claim.

The County filed its Motion for Summary Judgment on August 28, 2014.

## ANALYSIS

## I. The County's Motion to Strike the McAndrew Declaration

### A.  Generally

The defendant has filed a Motion to Strike the Declaration of Ron McAndrew, which was submitted by the plaintiff in support of her opposition to the Motion for Summary Judgment.  (Docket No. 47 (Motion to Strike); Docket No. 44, Ex. 9 (McAndrew Decl.).)  As an initial matter, a motion to strike is not a proper procedural method by which to defeat supporting documents that one party finds objectionable.  *See, e.g.*, *Foshee v. Forethought Federal Savings Bank*, No. 09-2674, 2010 WL 2158454, at *2 (W.D. Tenn. May 7, 2010); Wright & Miller, 5C *Federal Practice and Procedure* § 1380 (3rd ed.).  Federal Rule of Civil Procedure 12(f) authorizes a court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  However, as other district courts have pointed out, "[a]ffidavits and/or attached exhibits accompanying memoranda in support of motions for summary judgment, or the memoranda themselves for that matter . . . are not among the documents identified as 'pleadings' by the Federal Rules."  *Foshee*,

2020 WL 2158454, at *2. Consequently, the County's Motion to Strike is not a proper procedural device for its objections to the McAndrew Declaration.

Instead of striking evidence from the record, courts should simply disregard inadmissible evidence. *Lombard v. MCI Telecom. Corp.*, 13 F. Supp. 621, 625 (N.D. Ohio 1998) (citing *Dawson v. City of Kent*, 682 F. Supp. 920 (N.D. Ohio 1988), *aff'd*, 865 F.2d 257 (6th Cir. 1988)); *see State Mut. Life Assur. Co. of Am. v. Deer Creek Park*, 612 F.2d 259, 264 (6th Cir. 1979); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). Accordingly, the court will deny the County's Motion to Strike, but will consider whether it should *disregard* the McAndrew Declaration for purposes of the pending summary judgment motion.

### B. The County's Objections to the McAndrew Declaration

#### 1. Admissibility Standard for an Expert Declaration at Summary Judgment

A court has broad discretion in ruling on the admissibility of expert testimony, including at the summary judgment stage. *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 663 (6th Cir. 2005). Rule 56(c)(4) requires that an affidavit used to support or oppose a summary judgment motion must be made on personal knowledge; set out facts that would be admissible in evidence; and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c). An expert opinion offered at the summary judgment stage is held to the same standard as other declarations, as well as to Federal Rule of Evidence 702, which governs the admissibility of expert testimony. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reasonably applied the principles and methods to the facts of the case.

To satisfy both Fed. R. Civ. P. 56(c) and Fed. R. Evid. 702, the Sixth Circuit has instructed that, in the context of a summary judgment motion, an expert opinion "must be more than a conclusory assertion about ultimate legal issues." *Brainard*, 432 F.3d at 663 (internal citations omitted). "Moreover, an expert opinion must set forth facts and, in doing so, outline a line of reasoning arising from a logical foundation." *Id.* (additional citations omitted).

  2. <u>The McAndrew Declaration is Inadmissible</u>

  The County argues that the court should disregard the McAndrew Declaration because (1) the declaration is wholly conclusory, (2) Mr. McAndrew relied on insufficient facts or data to form his opinions, and (3) Mr. McAndrew's declaration is not relevant. Upon review of the declaration, the court agrees that the declaration lacks logical substance and, consequently, should be disregarded here.

  First, the McAndrew Declaration fails to indicate the reasoning or methods underlying McAndrew's opinions. Although Mr. McAndrew reviewed discovery materials provided by the County in addition to certain corrections facility manuals, his declaration fails to set forth specific facts to support his conclusions. For instance, Mr. McAndrew states that he has reviewed the American Correctional Association Performance-Based Standards for Adult Local Detention Facilities and a guide to Tennessee's minimum standard for correctional facilities, but he fails to compare those professional manuals to the policies or procedures of the Montgomery County Jail. Furthermore, Mr. McAndrew consistently employs broad and dramatic language without substance or analysis to describe the County's knowledge of the severity of Mr. Baggett's illness and subsequent action (or inaction) based on that purported knowledge. For example, Mr. McAndrew summarily concludes that (1) the Jail staff was aware of the severity of Mr. Baggett's illness, (2) the staff was improperly trained in terms of recognizing inmate needs

and providing adequate treatment, and—in a particularly egregious paragraph—that (3) "[p]lain established jail monitoring of those entrusted to the care and custody of the Montgomery County Jail would and should have prevented the untimely death of Mr. Baggett."

It is well settled that "an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Brainard*, 432 F.3d at 664. Mr. McAndrew's expert opinions, if properly conveyed in accordance with the Federal Rules of Evidence, are potentially highly relevant and would be valuable to a factfinder. Nevertheless, the McAndrew Declaration fails to comply with Fed. R. Civ. P. 56 and Fed. R. Evid. 702 and, accordingly, the court will disregard the declaration for purposes of this Memorandum.

## II.     The County's Motion for Summary Judgment

### A.  Rule 56 Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242 at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

### B. The Plaintiff's Section 1983 Claim

Ms. Portwood's claim against the County is premised on her allegation that the Jail failed to provide adequate medical care to Mr. Baggett. To defeat the County's pending motion, she must demonstrate that material questions of fact exist as to two specific questions: first, whether a constitutional violation occurred; and second, whether the County is liable for that violation.

#### 1. 42 U.S.C. § 1983

In order to establish a right to relief under Section 1983, a plaintiff must plead and prove at least two elements: (1) that he has been deprived of a right secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this right while acting under the color of law. *Turner v. Frey*, 166 F.3d 1215, 1215 (6th Cir. 1998). Ms. Portwood's Section 1983 claim is based upon Mr. Baggett's Eighth Amendment rights. The Eighth Amendment "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "Prison officials' deliberate indifference violates [an inmate's Eighth Amendment rights] 'when indifference is manifested by . . . prison guards in intentionally denying or delaying access to medical care' for a serious medical need." *Blackmore*, 390 F.3d at 895 (quoting

*Estelle*, 429 U.S. at 104). The Sixth Circuit has explained in detail a plaintiff's burden in

proving a violation of an inmate's right to access medical care for serious medical needs:

> A constitutional claim for denial of medical care has objective and subjective components. The objective component requires the existence of a sufficiently serious medical need. . . . The inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.
>
> The subjective component requires an inmate to show that prison officials have a sufficiently capable state of mind in denying medical care. This subjective component should be determined in light of the prison authorities' current attitudes and conduct. Deliberate indifference entails something more than mere negligence, but can be satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs is essential to a finding of deliberate indifference.

*Blackmore*, 390 F.3d at 896 (internal citations omitted).

### 2. Municipal Liability and Section 1983

A municipal entity, like the County, cannot be held liable under Section 1983 for an

injury inflicted solely by its employees or agents, as there is no *respondeat superior* liability

under the statute. *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 691

(1978); *see also Gregory v. Shelby Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000). Accordingly, in

order to establish liability on the part of the County, Ms. Portwood must demonstrate more than

simply the fact that the County employed individuals who engaged in some form of

unconstitutional conduct. The Supreme Court has held that municipalities may be subject to

damages under Section 1983, but only if the claimed injuries were caused by a policy or custom

of the municipality.[8] *Monell*, 436 U.S. at 691. "It is when execution of a government's policy or

---

[8] Liability may also be imposed upon a municipality where a failure to train employees (for instance, prison officials) amounts to deliberate indifference toward an inmate's serious need for medical care. *See City of Canton v. Harris*, 498 U.S. 378, 392 (1989). Although Ms. Portwood

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Section 1983." *Id.* at 694. For a municipality to be held liable under Section 1983, its "challenged policy need not be unconstitutional. Rather, a municipality may be liable if an employee's *application* of an otherwise constitutional policy leads to an unconstitutional result." *Monistere v. City of Memphis*, 115 F. App'x 845, 850 (6th Cir. 2004) (citing *City of Canton*, 489 U.S. at 388) (emphasis added); *see also Duley v. City of Struthers*, 72 F. App'x 242 (6th Cir. 2003).

The Sixth Circuit has offered guidance to plaintiffs asserting a Section 1983 claim on the basis of a municipal custom or policy. To succeed on her claim, a plaintiff must "identify the policy, connect the policy to the [County] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1994), *cert. denied*, 510 U.S. 1177 (1994); *see also Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 383 (2004).

Courts routinely grant summary judgment to municipal defendants where plaintiffs have failed to allege sufficient facts to establish a "direct causal link" between the policy and alleged constitutional violation, such that the defendant's deliberate conduct can be deemed the moving force behind the violation. *Graham*, 358 F.3d at 383; *Miller v. Calhoun Cnty.*, 408 F.3d 803, 814 (6th Cir. 2005). Accordingly, even if the court determines that Mr. Baggett suffered a deprivation of his constitutional right to adequate medical care, the County cannot be held liable

---

asserts that the County failed to train its employees in her FAC, she appears to have abandoned that ground of municipal liability at this stage and, therefore, the court need not consider it.

unless Ms. Portwood has provided sufficient evidence to establish that the constitutional violation occurred *because of* the County's policy.

### 3. Application to the Plaintiff's Claim

The County has moved for summary judgment as to both issues before the court. It argues that summary judgment is appropriate because the plaintiff has failed to establish any facts that show that the County was deliberately indifferent to Mr. Baggett's medical needs. It further argues that, even if the court determines that a constitutional violation occurred, the plaintiff has failed to allege sufficient facts to establish that the violation was caused by a custom or policy of the County and, therefore, the County cannot be held liable.

Upon careful review of the record before the court, the court concludes that it need not determine whether Mr. Baggett suffered a violation of his constitutional rights because, even assuming that a constitutional violation occurred, the County cannot be held liable for it.[9]

#### a. *No Question of Fact Exists with Respect to Municipal Liability*

---

[9] Although the court need not reach the issue of deliberate indifference, it notes that, as a general matter, the evidence before the court is not dispositive with respect to whether Mr. Baggett suffered from a serious medical need and whether the prison officials knowingly (or negligently) delayed medical treatment for Mr. Baggett. The court is especially concerned that there is no indication in the record that Mr. Baggett, in fact, refused medical care on January 30, 2012. The only witness to testify regarding Mr. Baggett's alleged refusal of care possesses no personal knowledge as to the event, and the County failed to present testimony from the deputies who allegedly interacted with Mr. Baggett that day and recorded the refusal. Accordingly, it is foreseeable that a reasonable factfinder might conclude the opposite—that Mr. Baggett, in fact, complained of illness on January 25, 2012, and was not treated until after he filed an additional complaint with the Jail and over a week had passed. Moreover, despite the County's arguments to the contrary, there is significant evidence in the record, including the sick call slips and testimony from corrections officers and Nurse Stephens, that Mr. Baggett suffered from severe symptoms related to his illness and that the Jail was aware of the severity of his illness.

Even if genuine issues of fact exist with respect to the County's deliberate indifference to Mr. Baggett's illness, summary judgment is appropriate for the County because the plaintiff has failed to meet the "stringent standards" of *Monell*. *Graham*, 358 F.3d at 383.

The Sixth Circuit has identified four ways that a plaintiff may demonstrate the existence of a municipality's illegal policy or custom. The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). Ms. Portwood's claim is based upon the fourth method—specifically, the County's sick call policy and what she asserts is an unwritten but widespread custom of tolerance toward deputies ignoring sick call slips.

The Sixth Circuit has articulated certain requirements for a municipal liability claim based on an "inaction theory," where a policy of tolerating constitutional violations is "unwritten but nevertheless entrenched." *Thomas*, 398 F.3d at 429. The court has instructed that, to succeed under such a theory, the plaintiff must show:

(1) the existence of a clear and persistent pattern of illegal activity;

(2) notice or constructive notice on the part of the defendant;

(3) the defendant's tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and

(4) that the defendant's custom was the "moving force' or direct causal link in the constitutional deprivation.

*Doe v. Claiborne Cnty.*, 103 F.3d 495, 507-08 (6th Cir. 1996).

The County has argued that, despite the plaintiff's sweeping allegations in her pleading regarding an "unwritten custom" of ignoring sick call slips, the plaintiff has failed to present a

genuine issue of material fact indicating that the Jail had such a custom. In rebuttal, the plaintiff points to three pieces of evidence that she contends create a dispute of fact as to the Jail's alleged policy of inaction: the testimony of Ms. Portwood as to her conversation with an employee at the Jail, Deputy Montjoy, and the deposition testimony of Mr. Baggett's two brothers, Zebediah and Joseph Baggett, who served time at the Jail and testified regarding the sick call process.

As an initial matter, Ms. Portwood's testimony as to Deputy Montjoy's statements[10] constitutes hearsay and, therefore, it must be disregarded at this stage. It is well established that a court may not consider hearsay when deciding a summary judgment motion. *Alpert*, 481 F.3d 404, 409 (6th Cir. 2007); *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997) ("The proffered evidence need not be in admissible *form*, but its *content* must be admissible. For instance, deposition testimony will assist a plaintiff in surviving a motion for summary judgment, even if the deposition itself is not admissible at trial, provided substituted oral testimony would be admissible and create a genuine issue of material fact.") Moreover, Deputy Montjoy's statements, which were made outside of the scope of his employment and apparently without any authorization of the County, do not fall within the hearsay exception for party-opponent admissions. *See* Fed. R. Evid. 801(d)(2).

Accordingly, the court's inquiry into whether Ms. Portwood has established a dispute of fact as to a "clear and persistent pattern of illegal activity" rests on the testimony offered by Mr. Baggett's brothers, who have both been inmates at the Jail. Ms. Portwood's strongest evidence

---

[10] Ms. Portwood testified that she had a conversation with Deputy Montjoy months after her son's death and that Deputy Montjoy told her that the Jail "murdered [Mr. Baggett] because they knew that he was sick and that he had put in sick calls and that they were ignored." (Docket No. 44, Ex. 1 at 20.)

is Joseph Baggett's testimony that, on at least one occasion in the past, the Jail "refused" his sick call slip. He testified as to the process of receiving medical care at the Jail:

> You put in a sick call. Then you write on it – you put it in your door or you hand it to a deputy. They look it over, read it over, see if it's any importance. *I've had some refuse.* They just stick it right back in your door. If it's not important enough to them, they just don't take it. I don't understand that part, but that's Montgomery County.

(Docket No. 44, Ex. 2 at 29.) Zebediah Baggett described the sick call process similarly, but, contrary to the plaintiff's assertions in her brief, Zebediah does not appear to have ever submitted a sick call slip (or been refused medical care after submitting a sick call slip). He testified:

> You put in a sick call. If one of the deputies pick it up and they feel like it's not an issue, they just stick it back in your door and keep rolling. They do for – like, if it's an issue, it still takes you like three to five days to be seen and it's supposed to only take like 24 hours. . . . I mean, that's what all the deputies say at the jail, it's supposed to take 24 hours to go to sick call.

(Docket No. 44, Ex. 3 at 18.)

In sum, the only admissible evidence in the record supporting a finding of a County policy of inaction is (1) Mr. Baggett's experience with the sick call slip process and his death and (2) Joseph Baggett's bald assertion that, on some unspecified occasion in the past, an unspecified person at the Jail refused him medical treatment by ignoring his sick call slip. Although Joseph's testimony and the events which led to Mr. Baggett's death are concerning to the court, this evidence is insufficient to represent a clear and persistent pattern of illegal activity. *See Thomas*, 398 F.3d at 433; *see also Doe*, 103 F.3d at 508. Moreover, the evidence fails to establish that the County knew or should have known about the alleged pattern of illegal activity, yet remained deliberately indifferent, and that the County's policy of inaction was the cause of Mr. Baggett's death here. The Sixth Circuit has explained that "a plaintiff bears a heavy burden in proving

municipal liability, and he cannot rely on a solely single instance to infer a policy of deliberate indifference." *Thomas*, 398 F.3d at 433.

Here, Ms. Portwood has failed to satisfy the requirements of *Monell* and its progeny by providing more than "merely colorable" evidence with respect to a pattern of illegal activity that could give rise to liability on the part of the County. Consequently, summary judgment is appropriate for the County as to Ms. Portwood's Section 1983 claim.

## III.    <u>The Remaining State Law Claims</u>

The County has also requested that the court dismiss the plaintiff's remaining state law claims against it. The plaintiff has requested that, if the court dismisses her federal claim, the state law claims be remanded to the state court in which she originally filed her action.

It is well settled that a federal court that has dismissed a plaintiff's federal law claims should ordinarily not reach the plaintiff's state law claims. *Moon v. Harrison Piping Supply*, 465 F.3d 797, 803 (6th Cir. 1996); *see* 28 U.S.C. §1367(c)(3). Indeed, there is a "strong presumption" against the exercise of supplemental jurisdiction once all federal claims have been dismissed. *Packard v. Farmers Ins. Co. of Columbus*, 423 F. App'x 580, 584 (6th Cir. 2011). Here, the court sees no extraordinary circumstances that would justify an exercise of residual jurisdiction over the plaintiff's remaining claims. Accordingly, because the court will dismiss the plaintiff's Section 1983 claim, it will decline to exercise supplemental jurisdiction over the plaintiff's state law claims and will remand the claims to the Circuit Court for Montgomery County, Tennessee, where the plaintiff originally filed her action.

## <u>CONCLUSION</u>

For the reasons stated herein, the defendant's Motion for Summary Judgment will be granted and the plaintiff's Section 1983 claim will be dismissed. It will further be ordered that

the plaintiff's remaining state law claims will be remanded to the Circuit Court for Montgomery County, Tennessee, where they were originally filed.

An appropriate order will enter.

Enter this 4th day of December 2014.

ALETA A. TRAUGER
United States District Judge